# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT NASHVILLE
Assigned on Briefs March 11, 2015

## STATE OF TENNESSEE v. GEORGE ROBERT HAMBY

**Appeal from the Circuit Court for Maury County**
**No. 21421     Stella Hargrove, Judge**

---

**No. M2014-00839-CCA-R3-CD – Filed May 28, 2015**

---

Appellant, George Robert Hamby, was convicted of aggravated robbery, a Class B felony.  The trial court sentenced appellant as a Range II offender to twelve years in confinement.  On appeal, appellant argues that: (1) the trial court erred in not accepting a negotiated guilty plea; (2) the trial court erred in denying appellant's motion for judgment of acquittal; (3) the evidence was insufficient to support his conviction; and (4) the trial court erred in sentencing.  Following our review of the evidence and the applicable law, we affirm the judgment of the trial court.

## Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Affirmed

ROGER A. PAGE, J., delivered the opinion of the court, in which JAMES CURWOOD WITT, JR., and CAMILLE R. MCMULLEN, JJ., joined.

Michael Dale Cox (on appeal), and Douglas K. Chapman (at trial), Columbia, Tennessee, for the appellant, George Robert Hamby.

Herbert H. Slatery III, Attorney General and Reporter; Ahmed A. Safeeullah, Assistant Attorney General; T. Michel Bottoms, District Attorney General; and Daniel J. Runde, Assistant District Attorney General, for the appellee, State of Tennessee.

## OPINION

This case arises from the September 30, 2011 armed robbery of a Family Dollar Store in Columbia, Tennessee.  Appellant was indicted for and convicted of aggravated robbery.  Appellant's trial began on February 19, 2013.

## I. Facts from Trial

Agent Vaygen Trimble, employed by the City of Columbia Police Department, testified that on Friday, September 30, 2011, at 8:15 p.m., he responded to reports of a robbery at the Family Dollar Store in the Northway Shopping Center in Columbia, Tennessee. Shortly after conferring with the people inside the store, Agent Trimble issued an alert for two individuals in a maroon, four-door Saturn. Agent Trimble processed the scene for latent prints, but he did not find any prints linking appellant to the scene, which he testified was common in a high traffic area like a store. Agent Trimble also testified that the surveillance cameras in the store did not capture video of the robbery.

Officer Brian Goats, a patrolman with the Columbia Police Department, testified that on September 30, 2011, he was serving as a detective in the investigative division. Officer Goats explained that he was assigned to investigate the Family Dollar Store incident in which money was taken from the cash drawer. After a Crime Stopper tip, Officer Goats's investigation focused on appellant, Donald Lankford, Christy Lankford, and Donald Trey Brymer.[1] Officer Goats found a maroon, four-door Saturn at the home of Jacklyn Fuller, appellant's mother. Officer Goats identified appellant and described him as having a "close shaved haircut, a mustache[,] and a small goatee." Officer Goats stated that appellant looked similar in his driver's license photograph, on the day of his initial interview in 2012, and at trial. Upon request from Officer Goats, Donald Brymer (Trey Brymer's father) brought a black air assault BB gun to the detective's division of the police department. Officer Goats explained that the BB gun looked similar to a real pistol.

During cross-examination, Officer Goats agreed that there was no DNA evidence or fingerprints linking appellant to either the scene of the crime or to the BB gun. Officer Goats also conceded that he was unaware that Ms. Fuller owned two red Saturns and that if true, he would be unable to definitively say that the red Saturn in the picture entered as evidence was the car used in the robbery. Officer Goats also conceded that the till from the cash drawer was never recovered and that the BB gun was not found at the crime scene.

Louis Realini testified that in September 2011, he was working as a cashier at the Family Dollar Store in the Northway Shopping Center in Columbia, Tennessee. At approximately 8:00 or 8:15 p.m. on September 30, 2011, Mr. Realini was working and heard the entrance and exit doors of the store open simultaneously, which caught his attention. Two men walked into the store wearing coats and ski-masks, and at least one

---

[1] Donald Brymer II and Donald Trey Brymer III were both witnesses at trial. For clarity, we will refer to Donald Brymer II as Donald Brymer or Mr. Brymer, and we will refer to Donald Trey Brymer as Trey Brymer or Trey. In doing so, we mean no disrespect.

of the perpetrators was wearing a hood. As the men entered the store, one of the men readjusted his mask, and Mr. Realini observed that the man was Caucasian and had a "goatee or facial hair on the bottom of his chin." Mr. Realini stated that the facial hair he observed on the day of the crime was "very close" in "shape and color" to appellant's facial hair at trial. After entering the store, the men walked to the cashier counter where Mr. Realini stood, and Mr. Realini saw the man with the facial hair holding a black matte finish semi-automatic handgun. Mr. Realini estimated that the gun was between a 9mm and a .40 caliber handgun. The man with the gun said, "'This is a robbery,'" and asked if Mr. Realini wanted to "'get shot.'" Mr. Realini responded, "'Absolutely not,'" and he scanned an energy drink so that his register would open. He then set the cash till on the counter and backed away. The men retrieved the cash till and exited the store. Mr. Realini described the men's demeanor as "very calm, very cool, [and] very collected" throughout the entire incident. After the men left the store, Mr. Realini gathered the remaining customers and the manager and went to the back of the store. Mr. Realini estimated that there was between $150 and $300 in the cash till when it was taken. At trial, Mr. Realini explained that the BB gun was the same black matte finish as the gun used by the perpetrators and that during the incident, he was unable to see if the barrel of the gun that was pointed at him would shoot a bullet or BB pellet. Mr. Realini explained that there were no surveillance tapes of the incident because the cameras had been turned from the cash register area to the clothing area due to suspected shoplifting. Mr. Realini explained that during the robbery, he felt nervous, scared, and in fear for his life. During cross-examination, Mr. Realini conceded that he could not positively identify appellant as one of the perpetrators of the Family Dollar Store robbery.

Jessica Bucklew testified that in September 2011, she was the assistant manager at the Family Dollar Store in Northway Shopping Center. She stated that she did not know that anything was amiss until the cashier ran to the back of the store. Ms. Bucklew stated that she gathered everyone remaining in the store and took them into the stockroom. She also called the police and the store manager, Sarah Gibson.

Rosemary O'Quinn testified that she was in the Family Dollar Store on September 30, 2011, when she heard men's voices and heard someone demand money. She said the conversation drew her attention because it was abnormal. Ms. O'Quinn paid closer attention when she heard the cashier speak louder, stating that the men could have the money. Ms. O'Quinn saw two men standing at the cashier's counter. She described the men as Caucasians of average weight and stated that both men were wearing masks. One man was wearing a black, hooded sweatshirt and was taller than the second perpetrator. The shorter man had brown facial hair and was holding a gun. Ms. O'Quinn deduced from his appearance and clothing style that he was "young." She said the gun was a black semi-automatic, "Glock kind of style" pistol and agreed that the BB gun she was shown at trial was similar to the gun used by the perpetrators. Ms. O'Quinn explained that after the verbal exchange with the cashier, the two men took the cash till and left the

store. During cross-examination, Ms. O'Quinn conceded that she could not definitively say that appellant was one of the perpetrators.

Ken Law, the store manager at Best Way Rent to Own in Northway Shopping Center, testified that on September 30, 2011, at 8:00 or 8:15 p.m., he was in front of his store, which was located beside the Family Dollar Store, smoking a cigarette. He saw two men walking toward the Family Dollar Store, and just before they entered the store, the men put masks over their faces. Mr. Law explained that one man was approximately 6′1 and that the second man was about 5′9 or 5′10. Mr. Law followed the men into the Family Dollar Store and saw both men standing at the cashier's counter. The shorter man had a pistol in his pocket and said, "'Give me the money or get shot,'" to the cashier. Mr. Law said that as he "lunged forward" to retrieve the pistol, the taller perpetrator turned around and saw him. After having been seen, Mr. Law changed course and fled from the store. Mr. Law returned to Best Way, locked the doors, and called 9-1-1. Mr. Law saw the two men leave the Family Dollar Store; enter a burgundy, four-door Saturn; and exit the parking lot. The car left the shopping center, turning south on Nashville Highway, and passed a police officer who had pulled over another vehicle. Mr. Law informed the 9-1-1 operator of the car's description, the direction it was going, and the officer's proximity.

Sarah Gibson, the store manager of the Family Dollar Store in September 2011, testified that on the night in question, she received a telephone call from Ms. Bucklew after 8:00 p.m. informing her that the store had been robbed at gunpoint. Ms. Gibson arrived at the store at approximately 8:30 p.m., and after the police had finished processing the scene, she "counted down the register" to determine how much money had been taken. A final accounting showed that $246.77 was missing. Ms. Gibson agreed that there was no surveillance video of the robbery.

Lisa Mealer, the fiancée of Donald Brymer, testified that she was at home on September 30, 2011, and that Trey Brymer was at the home of his mother, Christy Lankford. That evening, Trey and appellant came inside Ms. Mealer's house, while Ms. Lankford, a male named "Donald," and one of Trey's sisters waited in a maroon Saturn outside. Ms. Mealer assumed that Trey went to his bedroom. Appellant was intoxicated when he arrived, and after he made inappropriate sexual remarks to one of Ms. Mealer's friends who was visiting, Ms. Mealer asked appellant to leave. When appellant refused, Ms. Mealer requested Ms. Lankford's help in removing appellant from her home. Ms. Lankford retrieved appellant, and Trey exited the house. Ms. Mealer did not see Trey carrying anything. Ms. Lankford told Trey's sister that she needed to stay at Ms. Mealer's home because they had something to "take care of" and that she would return later. Ms. Lankford, "Donald," appellant, and Trey left the residence. When Donald Brymer, Trey's father, returned home, Ms. Mealer informed Mr. Brymer that Trey had visited, and due to Trey's habit of stealing, Mr. Brymer checked his bedroom and noticed

that a BB pistol was missing.  Mr. Brymer, Ms. Mealer, and the five remaining children in their care went to Ms. Lankford's and appellant's home.  Appellant, Ms. Lankford, "Donald," and Trey Brymer were all inside the home.  Upon request, Trey retrieved the BB gun from a bedroom and gave the gun to his father.  Ms. Mealer, Mr. Brymer, and the children returned home.

Trey Brymer testified that on September 30, 2011, he was thirteen years old and was fourteen years old on the day of trial.  Trey agreed that he had been adjudicated delinquent in both Maury County and Williamson County; some of the offenses would have been felonies if he had been tried as an adult.  As a result of his Williamson County adjudication, Trey was placed in a residential treatment center.  Trey also agreed that he had vandalism charges as well as the aggravated robbery charge from the Family Dollar robbery pending in juvenile court.  Trey stated that on September 30, he was staying with appellant, Ms. Lankford, and Donald Lankford.  Mr. Lankford is appellant's uncle.  Trey testified that despite sharing the same surname, Mr. and Ms. Lankford have no familial relationship.  Trey stated that appellant and Ms. Lankford were "going out" at the time.  Trey explained that he did not go to school that day because his mother allowed him to stay at home.  That afternoon, appellant, Trey, Ms. Lankford, and Mr. Lankford picked up Trey's brothers and sisters from the school bus stop and took them to Mr. Bymer's and Ms. Mealer's house at approximately 7:30 p.m.  Trey stated that he and appellant went inside the house and that appellant created a distraction so that Trey could go into his father's room and retrieve a BB gun.  Trey asserted that appellant and Ms. Lankford had asked him to retrieve the gun.  Trey believed that they would return to Ms. Lankford's home and have a "pellet gun war."  Appellant, Ms. Lankford, Mr. Lankford, and Trey returned to Ms. Lankford's house, and Trey changed into an all-black outfit in anticipation of the "pellet gun war."  Ms. Lankford told Trey to "get two toboggans," which he did.  Shortly thereafter, appellant and Ms. Lankford came into the kitchen where Trey sat "messing" with the gun.  Appellant took the gun and shot the covering of a light.  Twenty to thirty minutes later, appellant, Ms. Lankford, Mr. Lankford, and Trey left the house.  While in the car, Ms. Lankford told Trey that they needed to "'get some money.'"  Because Ms. Lankford saw a police officer, she drove to the Gulf gas station, waited for ten to fifteen minutes, and then proceeded to the Family Dollar Store.  Ms. Lankford parked her maroon Saturn in a parking space in front of the Family Dollar Store, and appellant and Trey exited the vehicle.  Trey explained that on the way inside, appellant threatened to shoot him, handed him a toboggan, and told Trey to "stand beside him[] and not say a word" and to keep his hands in his pockets.  Trey stated that appellant had the BB gun in his right hand and that appellant had a beard and a mustache at the time of the robbery.  Upon entering the store, appellant pointed the BB gun at the cashier's head and told the cashier, "'Give me the money or I'll blow your brains out.'"  Trey explained that the cashier scanned an item, and when the drawer of the register opened, the cashier handed over the "black little tray."  Appellant retrieved the till, and he and appellant walked out of the store, returning to Ms. Lankford's car.  They went back

to Ms. Lankford's house. After arriving, appellant put the BB gun in his and Ms. Lankford's bedroom, and Ms. Lankford gave Trey $20. Appellant counted the money, and then disposed of the cash tray, although Trey did not know where appellant put the till. Mr. Brymer arrived afterward and demanded the return of his BB gun. Although appellant advised against it, Trey gave the BB pistol back to his father.

During cross-examination, Trey conceded that he had grown taller since the time of the Family Dollar Store incident. Trey agreed that after the incident, he had a can of beer to celebrate the $20 he had just received. Trey also agreed that when leaving the robbery, Ms. Lankford did not turn onto Nashville Highway, but instead, she turned onto Riverside. Trey stated that he remembered where Ms. Lankford had parked because she had parked right beside a manhole cover.

Donald Brymer, Trey Brymer's father, testified that Trey was staying with Ms. Lankford on September 30, 2011, and that she had a maroon Saturn with a Kermit the Frog in the back window. Mr. Brymer described appellant's facial hair at the time as a goatee with sideburns and a partial mustache, which he said was about the same as appellant's facial hair at trial. Mr. Brymer testified that on September 30, he had a black Phantom Co2 cartridge BB pistol in his bedroom in a gun cabinet. Mr. Brymer explained that when he returned home that night at 8:00 p.m., the pistol was missing, and his girlfriend told him that his son had been at their house earlier. Mr. Brymer and his girlfriend went to Ms. Lankford's house, and when they arrived, appellant, Mr. Lankford, Ms. Lankford, and Trey were inside the house. Trey retrieved the pistol at Mr. Brymer's request, and Mr. Brymer returned home. Mr. Brymer stated that approximately one month later, he received a telephone call from Officer Goats asking him to bring the BB pistol to the police department.

Christy Lankford, Trey Brymer's mother, testified that she had been convicted of three felony counts of failure to appear, four counts of statutory rape, two violations of the Sex Offender Registry Act, aggravated burglary, theft, and facilitation of aggravated robbery. Ms. Lankford stated that on September 30, 2011, she and appellant were in a relationship. At the time, Ms. Lankford had an arrangement with appellant's mother to give her money in exchange for the maroon Saturn that she was allowing Ms. Lankford to drive. Ms. Lankford explained that appellant's mother had two maroon Saturns but that she was only purchasing one of them. Ms. Lankford stated that on the evening of September 30, she, appellant, Trey, and Mr. Lankford had been discussing the need to get money so that she could pay for her car. Due to the conversation, the four took appellant's sister to Mr. Brymer's house so that she would not be involved. Ms. Lankford, Trey, and appellant went inside the house. Ms. Lankford described appellant as being "[h]ighly intoxicated." Ms. Lankford asserted that she did not know that Trey had taken Mr. Brymer's gun until they returned to her house. Ms. Lankford, appellant, Mr. Lankford, and Trey went back to her house, and according to Ms. Lankford, the three

males made plans to commit a robbery.  Trey and appellant changed into all-black outfits. Ms. Lankford cut eye holes in a toboggan that was to be used for the robbery, and she drove the four of them to Northway Shopping Center.  Ms. Lankford stated that they collectively decided to stop at the shopping center because it was an "easy stop" due to the lack of surveillance equipment.  Appellant and Trey put on their masks, and Ms. Lankford let them out of the car in front of the Family Dollar Store.  Ms. Lankford then turned her car around and stopped to await appellant's and Trey's return.  The two men returned with a cash till, and Ms. Lankford drove back to her home.  After returning, the money was taken from the till, and the till and the toboggans were discarded.  Ms. Lankford and appellant divided the money between themselves.  Later that evening, Mr. Brymer came to Ms. Lankford's home, and Trey gave him the BB pistol.

During cross-examination, Ms. Lankford agreed that she had prior convictions for fraudulently using a credit card.  She stated that her memory of the events in question was hazy due to her crack cocaine usage at the time.  Ms. Lankford agreed that Trey had participated in all the conversations concerning the armed robbery.  On redirect examination, Ms. Lankford stated that on the day of the robbery, Trey was taller than appellant.

After considering this evidence, the jury convicted appellant of aggravated robbery, and the trial court sentenced appellant as a Range II offender to twelve years in confinement.  After the time elapsed for appellant to file a motion for new trial, appellant filed a *pro se* post-conviction petition and a subsequent motion requesting that he be allowed to seek a delayed appeal.  The post-conviction court granted appellant's request. Appellant filed his motion for new trial on February 4, 2014, and the trial court denied the motion on March 28, 2014.  Appellant filed a notice of appeal on April 28, 2014.

## II.  Analysis

Appellant argues that the trial court erred in not accepting a negotiated guilty plea; that the trial court erred in denying appellant's motion for judgment of acquittal; the evidence was insufficient to support his conviction; and that the trial court erred in sentencing.

### A.  Acceptance of Guilty Plea

Appellant argues that the trial court's refusal to accept a negotiated guilty plea prior to trial was error.  When an appellant challenges a trial court's failure to accept a guilty plea, we review that decision for an abuse of discretion.  *VanArsdall v. State*, 919 S.W.2d 626, 630 (Tenn. Crim. App. 1995) (citation omitted).  "A trial court abuses its discretion only when it applies an incorrect legal standard or makes a ruling that is illogical or unreasonable and causes an injustice to the party complaining."  *State v.*

*Franklin*, 308 S.W.3d 799, 809 (Tenn. 2010) (citations and internal quotation marks omitted).

First, we note that a defendant does not have an absolute right to have the trial court accept a guilty plea. *State v. Turner*, 713 S.W.2d 327, 329 (Tenn. Crim. App. 1986) (citing *Santobello v. New York*, 404 U.S. 257, 262 (1971)). The final decision whether to accept or reject a negotiated guilty plea rests solely with the trial court. *Id.* Second, in rejecting appellant's plea agreement, the trial court in this case relied on Local Rule of Practice 48.01 of the 22nd Judicial District to determine that appellant had not entered a timely-made plea. Local Rule 48.01 states, in relevant part:

> 48.01 Settlement Date and Deadline. At arraignment the court will assign a court date for settlement of the case which will be the deadline for acceptance of a negotiated disposition. If the record does not show the setting of a specific settlement date, such date shall automatically be the next month's docket day. At the settlement date, if the case has not been disposed of, the court will set the case for trial. Upon the docketing of the case for trial, the court may refuse to accept a negotiated disposition on the trial date, or even after the last preceding docket day, unless the interests of justice dictate otherwise.

"It is well settled that the trial courts of this state have the authority to make and implement reasonable local rules of practice and procedure in their respective courts, as long as these local rules do not conflict with a substantive rule of state law." *In re Int'l Fid. Ins. Co.*, 989 S.W.2d 726, 729 (Tenn. Crim. App. 1998) (citations omitted).

Prior to trial, the trial court noted that the settlement date, which was in May or June 2012, was "long gone" before appellant attempted to enter a guilty plea. The trial court also stated that on a case-by-case basis the judges of the district would allow defendants to plead guilty on the plea day of the month prior to the defendant's trial, which in appellant's case was January 2013; however, appellant did not plead guilty at that time. The trial court stated that instead of entering a timely plea, appellant "waited until right before trial to want to accept an offer." Furthermore, both prior to trial and at the motion for new trial hearing, the trial court reviewed the timeline for appellant's case, including arraignment, the appointment of three separate attorneys, the settlement date, and numerous continuances. Trial counsel also testified that the first attempt to plead guilty occurred after the January plea date.

Considering all of this information, we conclude that the trial court did not abuse its discretion when it refused to accept appellant's guilty plea. The trial court considered both the timeline of appellant's case and his failure to comply with Local Rule 48.01 when it denied appellant's request. Appellant has also not shown that Local Rule 48.01

conflicts with a substantive rule of state law, which would render the rule unreasonable and unenforceable. Appellant is without relief as to this issue.

### B. Motion for Judgment of Acquittal and Sufficiency of the Evidence

Appellant argues that the trial court erred in denying his motion for judgment of acquittal and that the evidence was insufficient to support his conviction. Specifically, appellant contends that there was insufficient proof to corroborate the testimony of appellant's accomplices, Trey Brymer and Christy Lankford.

A motion for judgment of acquittal raises a question of law, i.e., the legal sufficiency of the evidence, for determination by the trial court. *State v. Adams*, 916 S.W.2d 471, 473 (Tenn. Crim. App. 1995) (citing *State v. Hall*, 656 S.W.2d 60, 61 (Tenn. Crim. App. 1983)). Thus, on appeal, this court applies the same standard of review both to the trial court's denial of a motion for a judgment of acquittal and to the sufficiency of the convicting evidence underlying the jury's verdict. *State v. Carroll*, 36 S.W.3d 854, 869 (Tenn. Crim. App. 1999) (citing *State v. Ball*, 973 S.W.2d 288, 292 (Tenn. Crim. App. 1998)). Therefore, we will address appellant's claims regarding the motion for judgment of acquittal and the sufficiency of the evidence as one. In doing so, we must consider "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979) (emphasis in original) (citing *Johnson v. Louisiana*, 406 U.S. 356, 362 (1972)); *see* Tenn. R. App. P. 13(e); *State v. Davis*, 354 S.W.3d 718, 729 (Tenn. 2011). To obtain relief on this claim of error, appellant must demonstrate that no reasonable trier of fact could have found the essential elements of the offense beyond a reasonable doubt. *See Jackson*, 443 U.S. at 319. This standard of review is identical whether the conviction is predicated on direct or circumstantial evidence, or a combination of both. *State v. Dorantes*, 331 S.W.3d 370, 379 (Tenn. 2011); *State v. Brown*, 551 S.W.2d 329, 331 (Tenn. 1977).

### i. Sufficiency of the Evidence

To support a conviction of aggravated robbery, the State must prove that appellant intentionally or knowingly took property from Mr. Realini by putting him in fear by displaying an article used or fashioned to lead Mr. Realini to reasonably believe it to be a deadly weapon. Tenn. Code Ann. §§ 39-13-401, -402.

Purely as a matter of sufficiency of the evidence, without considering whether there was sufficient corroboration of accomplice testimony, there was sufficient evidence presented at trial to sustain appellant's aggravated robbery conviction. Viewed in the light most favorable to the State, the evidence showed that Ms. Lankford needed money and that Ms. Lankford, appellant, Mr. Lankford, and Trey concocted a plan to commit a

robbery. The four entered Ms. Lankford's maroon Saturn, and Ms. Lankford drove them to the Family Dollar Store. Appellant and Trey entered the store wearing masks, and appellant pointed a BB gun that looked like a semi-automatic pistol at Mr. Realini and demanded that Mr. Realini give the men money. Mr. Realini scanned an item and pulled the cash till from the register, giving it to the perpetrators. Appellant and Trey left the store, got back into Ms. Lankford's maroon Saturn, and went back to Ms. Lankford's home. Mr. Realini testified that during the robbery, he felt nervous, scared, and in fear for his life. Based on this evidence, a reasonable jury could have found the essential elements of aggravated robbery beyond a reasonable doubt. The only remaining issue is whether the testimony given by appellant's accomplices was properly corroborated.

## ii. Accomplice Testimony

"[A] conviction may not be based solely upon the uncorroborated testimony of an accomplice to the offense." *State v. Bane*, 57 S.W.3d 411, 419 (Tenn. 2001). Our supreme court has explained:

> [T]here must be some fact testified to, entirely independent of the accomplice's testimony, which, taken by itself, leads to the inference, not only that a crime has been committed, but also that the defendant is implicated in it; and this independent corroborative testimony must also include some fact establishing the defendant's identity. This corroborative evidence may be direct or entirely circumstantial, and it need not be adequate, in and of itself, to support a conviction; *it is sufficient to meet the requirements of the rule if it fairly and legitimately tends to connect the defendant with the commission of the crime charged*. It is not necessary that the corroboration extend to every part of the accomplice's evidence.

*Bane*, 57 S.W.3d at 419 (quoting *State v. Bigbee,* 885 S.W.2d 797, 803 (Tenn. 1994)).

This court has reiterated, "An accomplice is defined as one who 'knowingly, voluntarily, and with common intent participates with the principal offender in the commission of the crime alleged in the charging instrument.'" *State v. Tyree Robinson*, W2008-01001-CCA-R3-CD, 2009 WL 1741401, at *7 (Tenn. Crim. App. June 16, 2009) (quoting *State v. Griffis*, 964 S.W.2d 577, 588 (Tenn. Crim. App. 1997)). The pivotal inquiry into whether a witness is an accomplice rests upon "whether the witness could be indicted for the same offense as the defendant." *Id.* (citing *State v. Green*, 915 S.W.2d 827, 831 (Tenn. Crim. App. 1995); *State v. Lawson*, 794 S.W.2d 363, 369 (Tenn. Crim. App. 1990)). It is uncontested that Trey Brymer and Christy Lankford were accomplices in the Family Dollar armed robbery. Therefore, we must determine whether the State presented sufficient evidence from other witnesses to corroborate the two accomplices' testimony.

Trey and Ms. Lankford both stated that Ms. Lankford drove her maroon, four-door Saturn to and from the Family Dollar. Mr. Law testified that he saw the two perpetrators leave the Family Dollar Store and enter a burgundy, four-door Saturn. Ms. Mealer also testified that Ms. Lankford, appellant, and Trey had been in a maroon Saturn when they came to her house earlier in the day. Trey and Ms. Lankford testified that appellant was shorter than Trey and that he had facial hair. Furthermore, Trey stated that appellant brandished the BB gun during the robbery. Mr. Realini and Ms. O'Quinn testified that the shorter robber was the perpetrator who wielded the gun during the robbery, and Mr. Realini stated that the armed robber had facial hair and that the facial he observed on the day of the crime was "very close" in "shape and color" to appellant's facial hair at trial. Mr. Brymer also stated that appellant had facial hair at the time of Family Dollar Store incident that was similar to his facial hair at trial. Trey and Ms. Lankford testified that Trey and appellant wore masks covering their faces during the armed robbery. Mr. Realini, Ms. O'Quinn, and Mr. Law all stated that the perpetrators wore masks during the robbery. Finally, Trey and Ms. Lankford testified that the entire cash till was taken during the robbery, and Mr. Realini corroborated this statement. Taken together, the corroborated evidence fairly and legitimately connects appellant with the commission of the Family Dollar Store armed robbery. Therefore, the accomplice testimony was sufficiently corroborated by independent evidence from sources other than Trey Brymer and Christy Lankford. Appellant is not entitled to relief as to this issue.

## C. Sentencing

Appellant argues that the trial court erred in finding him a Range II, multiple offender for purposes of sentencing, and in anticipation of the State's arguing waiver due to appellant's failure to object to this classification at trial, appellant argues that the sentencing classification was plain error. Specifically, appellant argues that the State failed to prove that appellant's convictions from North Carolina and Florida would have been punishable as felonies in Tennessee. Appellant also argues that the trial court incorrectly determined at the sentencing hearing that he should serve one hundred percent of his sentence but transcribed the correct service of eighty-five percent on appellant's judgment. The State responds that the trial court did not commit plain error because appellant was properly sentenced as a Range II offender but concedes that appellant's judgment, rather than the trial court's ruling from the bench, reflects appellant's proper release eligibility.

When an accused challenges the length and manner of service of a sentence, this court reviews the trial court's sentencing determination under an abuse of discretion standard accompanied by a presumption of reasonableness. *State v. Bise*, 380 S.W.3d 682, 707 (Tenn. 2012). This court will uphold the trial court's sentencing decision "so long as it is within the appropriate range and the record demonstrates that the sentence is

otherwise in compliance with the purposes and principles listed by statute." *Id.* at 709-10. Moreover, under such circumstances, appellate courts may not disturb the sentence even if we had preferred a different result. *See State v. Carter*, 254 S.W.3d 335, 346 (Tenn. 2008). The party challenging the sentence imposed by the trial court has the burden of establishing that the sentence is erroneous. Tenn. Code Ann. § 40-35-401, Sentencing Comm'n Cmts.; *State v. Ashby*, 823 S.W.2d 166, 169 (Tenn. 1991).

### i. Offender Status

Appellant argues that the State failed to prove that he was a Range II, multiple offender because it failed to prove that appellant's convictions from North Carolina and Florida would have been punishable as felonies in Tennessee.

Because appellant agreed at trial that he was a Range II, multiple offender, we can only conduct a plain error review on appeal. *See* Tenn. R. App. P. 36(a). Our supreme court formally adopted this court's *Adkisson* test for reviewing claims of plain error:

> The Court of Criminal Appeals has developed five factors to consider when deciding whether an error constitutes "plain error" in the absence of an objection at trial: "(a) the record must clearly establish what occurred in the trial court; (b) a clear and unequivocal rule of law must have been breached; (c) a substantial right of the accused must have been adversely affected; (d) the accused did not waive the issue for tactical reasons; and (e) consideration of the error is 'necessary to do substantial justice.'"

*State v. Smith*, 24 S.W.3d 274, 282 (Tenn. 2000) (quoting *State v. Adkisson*, 899 S.W.2d 626, 641-42 (Tenn. Crim. App. 1994)). To rise to the level of "plain error," an error "'must [have been] of such a great magnitude that it probably changed the outcome of the trial.'" *Adkisson*, 899 S.W.2d at 642 (quoting *United States v. Kerley*, 838 F.2d 932, 937 (7th Cir. 1988)). All five factors must be established by the record before a court will find plain error. *Smith*, 24 S.W.3d at 282. Complete consideration of all the factors is not necessary when clearly at least one of the factors cannot be established by the record.

A multiple offender, for purposes of this case, is defined as a defendant who has two to four prior felony convictions "within the conviction class, a higher class, or within the next two (2) lower felony classes" as the conviction for which he is being sentenced. Tenn. Code Ann. § 40-35-106(a)(1). Prior convictions include convictions committed in another state that, if committed in this state, would have constituted a crime. *Id.* § 40-35-106(b)(5). "In the event that a felony from a jurisdiction other than Tennessee is not a named felony in this state, the elements of the offense shall be used by the Tennessee court to determine what classification the offense is given." *Id.* The original or a certified copy of the court record showing appellant's prior convictions is prima facie

evidence of the defendant's prior felony record. *Id.* § 40-35-202(a). Appellant was convicted of aggravated robbery, a Class B felony. *See* Tenn. Code Ann. § 39-13-402(b). Therefore, to qualify as a Range II, multiple offender, the trial court had to find that appellant had at least two prior felony convictions that were a Class D or higher. *Id.* § 40-35-106(a)(1). In the State's notice alleging that appellant was a Range II offender, the State relied on appellant's convictions for burglary and theft, both Class D felonies, committed in Tennessee; appellant's conviction for common law robbery in North Carolina; and appellant's conviction for carrying a concealed weapon in Florida.

At the sentencing hearing, the trial court stated that appellant had five prior felony convictions: attempted aggravated burglary; burglary; felony possession of marijuana; and two felony theft convictions. The trial court stated that appellant had twelve misdemeanor convictions, including carrying a concealed weapon. The trial court stated that appellant's conviction for possession of marijuana in Florida would be a felony in Tennessee because appellant received a one-year sentence in Florida. After considering all of this information, the trial court determined that appellant was a Range II, multiple offender.

However, it is not the sentence but the elements that control whether a conviction from another state would be a felony in Tennessee. *See* Tenn. Code Ann. § 40-35-106(b)(5). Despite the confusion in the trial court, it is clear from the record that the trial court did not abuse its discretion in sentencing appellant as a Range II, multiple offender. Appellant had convictions for burglary and theft from Tennessee that were both Class D felonies. These felonies have the same offense date of January 1, 2010; therefore, for purposes of this analysis, we will consider them one prior Class D felony in determining appellant's range. Appellant was also convicted of common law robbery in North Carolina. The North Carolina legislature has defined this as a "[r]obbery as defined at common law, other than robbery with a firearm or other dangerous weapon." N.C. Gen. Stat. § 14-87.1. The comparable statutory offense in Tennessee is robbery because robbery is defined as "the intentional or knowing theft of property from the person of another by violence or putting the person in fear." Tenn. Code Ann. § 39-13-401(a). In Tennessee, robbery is a Class C felony. *Id.* § 39-13-401(b). Therefore, appellant's common law robbery conviction from North Carolina would qualify as a predicate offense for offender classification purposes. Because only two prior felony convictions were necessary to sentence appellant as a multiple offender, we need not analyze appellant's other convictions. Given the level of deference accorded to sentencing decisions, the trial court did not abuse its discretion in sentencing as a Range II, multiple offender.

## ii. Release Eligibility

Regarding the conflict between the sentencing hearing transcript and the judgment, usually when there is such a conflict, the transcript controls. *State v. Moore*, 814 S.W.2d 381, 383 (Tenn. Crim. App. 1991) (citations omitted). However, in this case, the trial court's sentencing decision at the hearing was contrary to statutory law. At the sentencing hearing, the trial court stated that appellant was to serve twelve years at one hundred percent. However, pursuant to Tennessee Code Annotated section 40-35-501(k)(2), appellant must have had a previous conviction for aggravated robbery or especially aggravated robbery to justify one hundred percent service of his sentence. The trial court did not find that appellant had such a conviction, and the record reflects that appellant's only prior robbery conviction was for common law robbery. Nonetheless, the trial court correctly sentenced appellant to eighty-five percent service on appellant's judgment. *See* Tenn. Code Ann. § 40-35-501(k)(1). Because the transcript and the judgment differ but the transcript reflects an incorrect sentence, we would usually remand the case to the trial court to determine the appropriate sentence and for correction of the judgment if necessary. *See State v. Clark*, 67 S.W.3d 73, 79 (Tenn. Crim. App. 2001). However, in this case, it is clear from the record that the judgment is correct. Therefore, we affirm the judgment.

## CONCLUSION

Based on the parties' briefs, the record, and the applicable law, we affirm the judgment of the trial court.

_____
ROGER A. PAGE, JUDGE

-14-